UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DUANE ZIEMBA,
    *Plaintiff*,

    v.

MICHAEL LAJOIE, *et al.*,
    *Defendants*.

No. 3:11-cv-00845 (JAM)

**RULING GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

    While serving a state prison sentence, plaintiff discovered one day that he had a new cellmate. His cellmate had just been transferred to plaintiff's prison after having tried to murder his last cellmate at a different prison and after warning prison officials that he would murder any future inmate assigned to live with him. Within hours of the new cellmate assignment, the cellmate allegedly launched a violent attack against plaintiff and attacked him again the next day.

    Plaintiff has filed this lawsuit contending in principal part that numerous prison officials were deliberately indifferent to his constitutional rights and that they put him in danger to retaliate for his many prior complaints about them. Defendants have moved for summary judgment. I will grant the motion in part and deny it in part, as I conclude that there are genuine issues of fact for trial as to two of the remaining prison official defendants.

**BACKGROUND**

    The complaint in this case alleges numerous causes of action arising from plaintiff's imprisonment at Northern Correctional Institution (NCI) in Somers, Connecticut. All of the causes of action stem from plaintiff's basic claim that prison officials decided and allowed him to be housed in a prison cell with extraordinarily dangerous inmates who prison officials knew or were deliberately indifferent to the possibility that they would attack him.

1

Plaintiff has named the following defendants: Brian Murphy, the former Acting Commissioner of the Connecticut Department of Correction (DOC); Michael Lajoie, the former District Administrator of the DOC; Angel Quiros, the former warden of NCI; and Jason Cahill, a former captain and unit manager of the 1 East Housing Unit at NCI.

Following the Court's prior grant in part of a motion to dismiss (Doc. #43) and plaintiff's motion to withdraw his claims against certain defendants (Doc. #64), the following claims remain against the following defendants in this case:

- Count Two alleges against Quiros and Cahill a claim of deliberate indifference and failure to protect under the Eighth Amendment of the United States Constitution.
- Count Three alleges against Quiros a claim of supervisory liability for Cahill's violation of plaintiff's constitutional rights.
- Count Four alleges against Quiros and Cahill a claim of retaliation in violation of plaintiff's rights under the First Amendment of the United States Constitution.
- Count Five alleges an assortment of state law claims against Murphy, LaJoie, Quiros, and Cahill.

Defendants now move for summary judgment as to all the remaining claims, except that Cahill does not seek summary judgment as to the federal constitutional claims asserted against him to the extent that they are not premised on allegations of negligence.[1]

The following facts are presented in the light most favorable to plaintiff as the non-moving party. NCI is a maximum security prison facility. It features an administrative

---

[1] The Court has previously dismissed plaintiff's federal law claims to the extent that they may be based on allegations of negligence. *See* Doc. #43 at 9. Defendants' summary judgment motion does not raise or argue a defense of qualified immunity. Accordingly, for purposes of summary judgment, I conclude that any claim of qualified immunity has been waived at least for summary judgment purposes. *See Harris v. Miller*, 818 F.3d 49, 63 (2d. Cir. 2016); *see also Zarvis v. Albany County*, 75 Fed. App'x 837, 838 (2d. Cir. 2003) (dismissing interlocutory appeal where appellants failed to move for summary judgment on qualified immunity grounds).

segregation unit that Connecticut uses for inmates who have caused severe problems at other Connecticut prison facilities. Some of the inmates at the administrative segregation unit are housed in single cells, and others are housed in cells with other inmates.

Plaintiff has a long disciplinary history while imprisoned numerous times in Connecticut, including at least three prior designations to the administrative segregation unit at NCI in 1998, 2002, and 2008. Doc. #140-1 at 5–6 (describing prior incidents). In September 2009, plaintiff was transferred to NCI after having been the subject of disciplinary proceedings while at another prison facility involving his alleged assault on a correctional officer. At NCI he was eventually designated to the administrative segregation unit.

Defendant Jason Cahill was the manager of plaintiff's unit. Plaintiff had numerous run-ins with Cahill throughout October 2009, and he complained vociferously to the warden—defendant Angel Quiros—about Cahill's treatment of him, and then complained in turn that Quiros was not responding appropriately to his complaints.[2]

Soon enough, there was another arrival to the administrative segregation unit at NCI: inmate Michael Giangreco. At the time, Giangreco was serving a 30-year sentence for murder. Giangreco had ended up at NCI because he had brutally attacked his cellmate on October 6, 2009, while at another prison facility—the MacDougall-Walker Correctional Institution (MacDougall).

---

[2] *See, e.g.*, Doc. #150-1 (Exh. 8) (complaint letter of October 8, 2009, from plaintiff to Quiros regarding alleged use of excessive force against plaintiff by Cahill and request to preserve evidence and video for litigation purposes); Doc. #150-2 (Exh. 9) (further complaint and response by Quiros); Doc. #150-3 (Exh. 10) (further complaint letter of October 14, 2009, by plaintiff to Quiros alleging that "Captain Cahill has in fact very seriously and repeatedly threatened me and subjected me to acts of retaliation . . . which you have . . . been informed of but have failed utterly and uniformly to stop, remedy wrong, or properly investigate" and that "the record reflects you have each hands on promoted it, and condoned it"); *see also* Doc. #149-2 at 50–52 (detailing complaints to Quiros prior to November 4, 2009); *Ziemba v. Thomas*, 390 F. Supp. 2d 136, 151–52 (D. Conn. 2005) (concluding with respect to prison litigation by same plaintiff that "there is a genuine issue of material fact with regard to defendant [warden's] knowledge of prison officials' retaliatory acts against plaintiff and, also, [warden's] attempt or failure to remedy the situation").

During this attack, Giangreco hit his cellmate with the metal legs of Giangreco's wheelchair while the cellmate was sleeping. Afterwards, Giangreco yelled out—apparently to MacDougall staff—"I killed my cellmate and maybe now you would do your jobs." Doc. #149-1 at 11. The disciplinary hearing notice reports that Giangreco "admitted that [he] wanted to remain on single cell status for the remainder of [his] incarceration by any means necessary including murder." Doc. #150-3 (Exh. 25).

Fortunately, Griangreco's cellmate survived this horrible attack, but not without severe injuries requiring hospitalization. Giangreco was placed in Restrictive Housing. It was noted on the DOC's order for this placement that "[t]he inmate's continued presence in the general population poses a serious threat to life, property, self, other inmates . . . ." Doc. #150-3 (Exh. 26). To the same effect, a mental health evaluation of Giangreco from shortly after the MacDougall attack warned that Giangreco "reports [he] will assault if put in w another cellie." *Id.* at 14. The warden at MacDougall wrote a letter to another prison official on October 7, 2009, describing Giangreco's attack in detail, noting that Giangreco "intentionally and viciously assaulted his cell partner . . . with a weapon while he was asleep," and that "Giangreco has demonstrated that he is a direct threat to the safety and security of the institution, staff, and inmates." Doc. #150-3 (Exh. 24).

Notwithstanding these chilling signs, Cahill directed the assignment of Giangreco to live in the same cell with plaintiff on November 4, 2009, just four weeks after Giangreco had nearly murdered his last cellmate. Not surprisingly, another attack very soon followed that day. Giangreco repeatedly and without provocation punched plaintiff, causing him to stumble and hit his head on the cell wall. Giangreco yelled at plaintiff saying that that he was "going to murder [him] the first chance [he] get[s]." Doc. #1 at 7 ¶20.

As a result of Giangreco's attack, plaintiff sustained injuries including a cracked tooth, cuts inside of his mouth, bruises, and swelling of his face and head. At one point during the time in which they were cellmates, Giangreco also threatened plaintiff, stating that he had just killed his cell partner at MacDougall and intended to kill plaintiff at the first possible moment. Doc. #149-1 at 15.

Plaintiff wrote complaints that day to both Cahill and Quiros, advising them that Giangreco threatened to "murder me the first chance he gets." Doc. #150-3 at 37–38. According to plaintiff, Cahill said that plaintiff "must work out [his] difference with Giangreco and no cell partner changes will be made." Doc. #1 at 8 ¶22.

On the next day, November 5, Giangreco again attacked plaintiff, this time while plaintiff was using the toilet. As a result of this attack plaintiff sustained injuries to his neck, throat, and back.

On November 6, Giangreco was moved out of the cell. Later that day, Cahill told plaintiff that "I promise, your next cell partner will be worse." *Id.* at 9. Plaintiff then yet again wrote numerous requests and letters to defendants Murphy, Quiros, and Cahill.

One week later, on November 13, another inmate—Robin Conte—was assigned as plaintiff's new cellmate. *Id.* From November 13 to 17, plaintiff and Conte were cellmates. Prior to being assigned as plaintiff's cellmate, Conte had been on single-cell status for over thirteen years due to brain injury, extreme violence, and a history of attacking cellmates. Doc. #150-2 at 73. During the four days that Conte and plaintiff were cellmates, Conte repeatedly threatened plaintiff, but there were no physical altercations between the two. Plaintiff complained to Cahill, and Cahill responded by stating that "no cell partner changes are being made." Doc. #1 at 10.

5

Then, on November 17, defendant Angel Quiros—NCI's warden—toured plaintiff's cellblock. Quiros stopped by plaintiff's cell and allegedly threatened him, stating, "I guarantee you I'm gonna make sure you rot and die in here since you want to sue department officials." *Id.* Quiros's statement was just one of a series of threatening statements allegedly made to plaintiff by Quiros or Cahill between October 2009 and February 2010, many of which reflected frustration with plaintiff's frequent litigation against the DOC. Doc. #150-2 at 10–42.

## DISCUSSION

The principles governing a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (*per curiam*). "A genuine dispute of material fact exists for summary judgment purposes where the evidence, viewed in the light most favorable to the nonmoving party, is such that a reasonable jury could decide in that party's favor." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 843 (2d Cir. 2013). The evidence adduced at the summary judgment stage must be viewed in the light most favorable to the non-moving party and with all ambiguities and reasonable inferences drawn against the moving party. *See, e.g.*, *Tolan*, 134 S. Ct. at 1866; *Caronia v. Philip Morris USA, Inc.*, 715 F.3d 417, 427 (2d Cir. 2013). All in all, "a 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Tolan*, 134 S. Ct. at 1866 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

### *Federal Claims against Quiros*

Plaintiff alleges that Quiros was deliberately indifferent to his safety; that Quiros retaliated against plaintiff for engaging in constitutionally protected conduct; and that Quiros

failed to adequately train, supervise, and discipline those under his authority and is therefore liable for the violations that occurred under his supervision. For the reasons described below, I conclude that plaintiff has raised a genuine issue for trial on each of these claims.

### A. Deliberate Indifference

"A prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Farmer v. Brennan*, 511 U.S. 825, 828 (1994). A deliberate indifference claim has an objective and subjective component. The plaintiff must prove that the harm was objectively serious, and that the charged officials "act[ed] or fail[ed] to act while *actually aware* of a substantial risk" of that serious harm. *Spavone v. New York State Dept. of Correctional Servs.*, 719 F.3d 127, 138 (2d Cir. 2013).

The Supreme Court in *Farmer* considered an Eighth Amendment deliberate indifference claim in a somewhat similar procedural and factual context: whether to grant summary judgment on an issue of inmate-on-inmate violence. The Court held that

> [i]f an Eighth Amendment plaintiff presents evidence showing that a substantial risk of inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk.

*Farmer*, 511 U.S. at 842–43. (internal citations omitted).

Plaintiff has met this threshold in two ways. First, he has shown that Giangreco's dangerousness was documented sufficiently that a trier of fact could conclude that Quiros, who was in charge of NCI, had been aware of it. Giangreco had recently attacked his prior cellmate in an extremely violent manner, and had said that he would kill his next cellmate. Both Giangreco's violence and his statement about his future intentions were documented via multiple channels: Giangreco's health evaluation; a letter by the MacDougall warden to the acting director of

7

population management at MacDougall; and NCI's own hearing notice given to Giangreco. Doc. # 150-3 (Exhs. 24, 25, 31). Admittedly, plaintiff has not provided specific evidence that proves Quiros was directly informed of Giangreco's transfer to NCI and the risk he posed. But Quiros has admitted that he was responsible for administering the operations of NCI, and that he was responsible for inmate safety at NCI. Doc. #150-3 (Exh. 20). While it is a close call, examining the evidence in the light most favorable to plaintiff, I conclude that it would be possible for a jury to find that Quiros knew about the risks Giangreco posed to other inmates, including plaintiff.

Even if plaintiff's evidence were not sufficient to show a jury issue on Quiros's knowledge of Giangreco in particular, plaintiff has also sufficiently demonstrated Quiros's deliberate indifference with regard to the system Quiros maintained to manage inmate risk classification. According to defendants, they did not act with deliberate indifference, because they maintain that plaintiff and Giangreco were assigned to be in the same cell in accordance with NCI's use of standardized inmate classification risk-assessment scores that are generated at the time that an inmate begins his custody with the DOC. Defendants describe a multi-factor test that is used to assess an inmate's risk for purposes of housing assignments:

> An inmate's overall risk level is determined by seven risk factors including escape profile or risk, the severity/violence of current offense, history of violence, length of sentence, presence of pending charges and/or detainers, disciplinary history, and security risk group membership. In addition management subcodes are used to help facilitate proper management. Each risk factor is assigned a score. The higher the score, the higher the risk of that factor.

Doc. #140-1 at 3.

Especially relevant here is the "history of violence" score. Defendants contend that the "[h]istory of violence is a rating based on an inmate's *recent* conviction information noting how violent the inmate was historically." *Id.* (emphasis added). But it is undisputed that nothing in

8

this risk assessment mechanism requires updating at the time an inmate is assigned to NCI and to take account of the fact that Giangreco had very nearly murdered his last cellmate less than a month before being assigned to the same cell as plaintiff. Giangreco's classification was never updated to reflect this very recent near-murderous attack on another cellmate—the very reason why Giangreco was transferred to NCI in the first place. As defendants' own summary judgment evidence reflects, neither plaintiff nor Giangreco were assessed a "classification score that would preclude them from having a cellmate due to medical or mental health concerns and each would have been considered safe for purposes of cellmate assignment in the Administrative Segregation housing unit at NCI." Doc. #140-2 at 7.

At oral argument, defendants were unable to identify any manner in which DOC's risk assessment procedure takes account of the most recent and relevant data about an inmate's dangerous behavior. This is especially alarming for inmates who are placed at NCI, because the administrative segregation unit at NCI is intended in large part as a collection point for the proverbial worst-of-the-worst inmates who have proved most dangerous and incorrigible at other correctional institutions. It defies common sense that NCI's procedure for deciding on cellmate assignments (and whether an inmate is safe at all to be housed with another inmate) would not take account of the fact that an inmate has recently tried to murder his cellmate and vowed to try to murder again if assigned another cellmate.

In my view, the lack of a procedure at NCI to account for recent, starkly lethal risk warnings in the DOC's own records was indicative of deliberate indifference by NCI and its warden—then defendant Quiros—to the life and welfare of other inmates who had no choice but to be housed with those that NCI decided to assign them. No amount of numerical, multi-factor risk assessment formulas can paper over ignorance of the most obvious evidence of risk—

evidence that was elsewhere in readily accessible DOC files that prompted the inmate's transfer to NCI.[3]

As the Supreme Court noted in *Farmer*, "the Constitution does not mandate comfortable prisons," but "prison officials have a duty … to protect prisoners from violence at the hands of other prisoners." 511 U.S. at 832–33. Here, plaintiff has established at least a triable issue of fact that he was not only "incarcerated under conditions posing a substantial risk of harm," *id.* at 834, but also the requisite deliberate indifference by Quiros to the risk of that harm, *id.* at 842 ("the official acted or failed to act despite his knowledge of a substantial risk of harm").

My conclusion in this respect is reinforced by evidence against Quiros with respect to plaintiff's claims of First Amendment retaliation as separately discussed below. Of course, Quiros will be free at trial to try to show that he was not aware of a risk of harm and that he did not otherwise act for any retaliatory reason; my conclusions at this point are solely with respect to whether there is a triable issue of fact on these issues.[4] A jury could reasonably find that Quiros failed to act while actually aware of the serious risk posed by Giangreco in particular or by the serious inadequacies in NCI's system of inmate classification more broadly. I therefore deny Quiros's motion for summary judgment on this claim.

---

[3] In an interrogatory response, Quiros stated that "Giangreco was separated from other inmates following 10/6/09 incident, [and] subsequently celled with other inmates when considered safe," Doc. #150-2 at 86, but does not explain any basis for concluding that Giangreco was safe to be assigned to live with plaintiff on November 4, 2009.

[4] Although Quiros has submitted an affidavit that he did not direct the assignment of Giangreco or Conte to be housed with plaintiff, Doc. #140-3 at 2, I am not required to credit this affidavit in light of the contrary circumstantial evidence presented by plaintiff and my obligation to view the facts at this stage in the light most favorable to plaintiff as the non-moving party. The same holds true for the affidavit submitted by defendants from Giangreco in which Giangreco denies having attacked plaintiff. Doc. #140-8 at 2–4.

*B.  First Amendment Retaliation*

Plaintiff also claims unconstitutional retaliation. As described above, plaintiff pressed numerous complaints against prison officials, including the filing of complaints about both Cahill and Quiros within weeks before his assignment to the same cell as Giangreco and Conte.

To prevail on this First Amendment-based claim, plaintiff must prove (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action. *See Espinal v. Goord*, 558 F.3d 119, 128–29 (2d Cir. 2009).

The first required showing is easily met—the filing of prison grievances and lawsuits is activity protected by the First Amendment. *Id.*; *Davis v. Goord*, 320 F.3d 346, 352–53 (2d Cir. 2003). "Adverse action," meanwhile, is defined by the Second Circuit to be action "that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004). As just discussed, plaintiff has raised a genuine issue of fact as to whether Quiros was aware of the danger plaintiff was exposed to by being celled with Giangreco, but was deliberately indifferent to that risk and allowed plaintiff to be celled with Giangreco. It would be possible for a reasonable jury to find that allowing plaintiff to be placed in a cell with someone who had indicated an intent to murder his next cellmate—and had in fact severely beaten his prior cellmate a few weeks earlier—is action that would deter someone of ordinary firmness from exercising his or her constitutional rights to complain about prison officials.

Plaintiff has also provided sufficient evidence for a reasonable jury to find a causal connection between his complaints and the adverse action he describes. In addition to his own account, plaintiff has submitted affidavits from six other inmates who attest to overhearing

11

conversations between plaintiff and defendants Cahill, Quiros, or both. Doc. #150-2 (Exhs. 11–17). In these conversations, which occurred between October 2009 and February 2010, Cahill and Quiros expressed frustration with plaintiff's lawsuits. They also indicated that their frustration with plaintiff's suits was connected to their treatment of plaintiff. Cahill, for instance, repeatedly indicated that shakedowns of plaintiff's cell and confiscation of plaintiff's property were connected to plaintiff's lawsuits, and said "you can complain all you want to [Quiros] and [defendant] Murphy, no one is going to help you when you are suing every supervisor in the DOC." Doc. #150-2 at 17. At one point, Quiros allegedly told plaintiff "stop all your writing antics, and no one will mess with you anymore." *Id.* at 41. And, according to plaintiff, after plaintiff complained about the cell assignments, Quiros said "I guarantee you I'm gonna make sure you rot and die in here since you want to sue department officials." Doc. #1 ¶32.

These alleged statements by Cahill and Quiros suggest that DOC officials viewed him as a thorn in their side both before and after plaintiff was celled with Giangreco and Conte. The statements also suggest that Cahill and Quiros were willing to "mess with" plaintiff to pressure him to cease his protected activity. While plaintiff may not have direct evidence that Quiros placed Giangreco in plaintiff's cell due to plaintiff's grievances or legal filings, a causal connection can be proven via indirect evidence. *See, e.g.*, *Gorman-Bakos v. Cornell Co-op Extension of Schenectady County*, 252 F.3d 545, 554 (2d Cir. 2001). Quiros and Cahill's references to plaintiff's lawsuits, their threats to plaintiff, and the temporal proximity between their statements and plaintiff's placement in cells with Giangreco and Conte could allow a jury to legitimately infer a causal connection between his lawsuits and Quiros's alleged hostility and deliberate indifference.

C.  *Failure to Adequately Train, Supervise, or Discipline*

Plaintiff also argues that Quiros is liable under a theory of supervisory liability. Officials may not be held liable in a § 1983 action under a simple *respondeat superior* theory of liability. *See Monell v. New York City Dept. of Social Servs.*, 436 U.S. 658, 694 (1978). Instead, it is necessary to show their "personal involvement . . . in alleged constitutional deprivations." *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995) (internal citation omitted). In the Second Circuit, such personal involvement may be shown by evidence that

> (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom; (4) the defendant was grossly negligent in supervising subordinates who committed wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.*

There is some debate as to whether all five of these paths are still available to plaintiffs after *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009), in which the Supreme Court rejected the argument that a supervisor's "mere knowledge" of a subordinate's intentionally discriminatory actions was sufficient to generate supervisory liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013) (noting that *Iqbal* "may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations"); *Hill v. Laird*, 2016 WL 3248332, at *5–*6 (E.D.N.Y. 2016) (collecting cases). But *Iqbal* dealt specifically with allegations of intentional discrimination, and the Court noted explicitly that the factors necessary to establish liability "will vary with the constitutional provision at issue." 556 U.S. at 676; *see also Turkmen v. Hasty*, 789 F.3d 218, 250 (2d Cir. 2015) (same).

A claim of deliberate indifference, grounded in the Eighth Amendment, differs from intentional discrimination claims like the claim in *Iqbal*. Deliberate indifference claims are governed by "an approach consistent with recklessness in the criminal law," rather than a standard based on purpose or intent. *Farmer*, 511 U.S. at 837. Under this recklessness standard, the relevant question is whether an official "consciously disregard[ed] a substantial risk of serious harm." *Id.* at 839 (internal citation omitted). This standard is consonant with the liability tests listed in *Colon*—such as failing to remedy a wrong despite being informed of it—that fall short of purposeful involvement but require some sort of knowing disregard. *See Colon*, 58 F.3d at 873; *see also Drew v. City of New York*, 2016 WL 4533660, at *12 (S.D.N.Y. 2016) (concluding that *Iqbal* does not affect application of the *Colon* factors in cases "where the constitutional claim does not require a showing of discriminatory intent, but instead relies on the unreasonable conduct or deliberate indifference standards").

Plaintiff has presented evidence sufficient to create a genuine issue of fact regarding Quiros's liability for violations of plaintiff's Eighth Amendment rights under the *Colon* tests. Quiros was responsible for administering, coordinating, and controlling operations at NCI as well as for supervising NCI employees. He was also responsible for the establishment and enforcement of policies, customs, procedures, and directives. Doc. #150-2 at 66.

Defendants do not argue that any aberration caused the placement of plaintiff in a cell with an inmate who had declared his intent to murder his next cellmate. To the contrary, they assert that Cahill followed standard practices and procedures. Doc. #140-11 at ¶16. They also conceded during oral argument that lags in updating the inmate risk categorization system were commonplace. And plaintiff submitted numerous notes, letters, and grievances to Quiros and other NCI staff during the time when he was celled with Giangreco or Conte.

This evidence could be sufficient for a reasonable jury to find that Quiros "after being informed of [a] violation through a report or appeal, failed to remedy the wrong," that he "participated directly in the alleged constitutional violation," that he "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," that he "was grossly negligent in supervising subordinates who committed wrongful acts," or that he "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon*, 58 F.3d at 873. It would therefore be inappropriate to grant summary judgment on plaintiff's Eighth Amendment claim against Quiros in his role as supervisor and policymaker for NCI.

As to plaintiff's claim that Quiros violated his First Amendment rights by his failure to adequately train, supervise, or discipline staff at NCI, it is less clear whether the *Colon* factors are the appropriate post-*Iqbal* test. *Iqbal* itself involved a First Amendment claim, and, as discussed above, rejected the argument that "mere knowledge of [a] subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Iqbal*, 556 U.S. at 677. Nevertheless, it is unnecessary to determine what the minimal standard is that plaintiff must meet, because—even if *Iqbal* applies—plaintiff has made a sufficient showing for a jury to find that Quiros, through his "own individual actions, has violated the Constitution." *Id.* at 676. As discussed above, Quiros's direct statements to plaintiff could allow a jury to infer that Quiros was personally motivated by a desire to retaliate against plaintiff for plaintiff's lawsuits. Whether that motivation expressed itself through Quiros's own actions to arrange plaintiff's cellmates or through Quiros's approval of his subordinate's actions, there is enough here that a jury could find that Quiros acted purposefully, not merely knowingly.[5]

---

[5] Defendants point out that plaintiff alleges that he was physically harmed only by Giangreco, and that he does not asset any physical altercation with Conte. They argue that as a result, they are entitled to summary

15

*State Law Claims*

In addition to his federal claims against Quiros and Cahill, plaintiff alleges state tort law claims and claims based on Connecticut's constitution against Quiros, Cahill, Murphy, and Lajoie. I will consider each of these in turn.

A. Battery

Plaintiff alleges defendants committed the tort of battery against him. Defendants argue that plaintiff's battery claim fails as a matter of law. I agree with defendants. In Connecticut, battery "has been defined as any touching of the person in rudeness or in anger." *Smith v. City of New Haven*, 166 F. Supp. 2d 636, 644–45 (D. Conn. 2001). Battery requires some act of physical touching by the defendants or their instrumentality. *See generally* Restatement (Second) of Torts § 18. Plaintiff has not alleged that any defendant had physical contact with him; defendants' motion for summary judgment on this claim is therefore granted.

B. *Intentional Infliction of Emotional Distress*

Plaintiff also argues that defendants committed the tort of intentional infliction of emotional distress (IIED).[6] To prevail in this claim plaintiff must establish:

> (1) that defendants intended to inflict emotional distress or knew or should have known that their conduct would likely result in emotional distress; (2) that the conduct was extreme and outrageous; (3) that the conduct in question was the cause of plaintiff's distress; and (4) that the emotional distress experienced by plaintiff was severe.

*Betancourt v. Slavin*, 676 F. Supp. 2d 71, 81 (D. Conn. 2009); *see also Appleton v. Board of Education of Stonington*, 254 Conn. 205, 210 (2000). Extreme and outrageous conduct is defined

---

judgment on any of plaintiff's claims for mental or emotional injury resulting from being celled with Conte. They are correct that 42 U.S.C. §1997e(e) bars recovery "for mental or emotional injury suffered while in custody without a prior showing of physical injury." I note, however, that §1997e(e) bars recovery of mental and emotional damages alone, and so does not bar plaintiff from seeking nominal damages for the violation of his constitutional rights or punitive damages in connection with being celled with Conte. *See Thompson v. Carter*, 284 F.3d 411, 418 (2d Cir. 2002).

[6] Plaintiff also raised a claim of negligent infliction of emotional distress; this claim, along with all his claims based on negligence, were dismissed earlier in these proceedings. Doc. #43 at 9–10.

by the Connecticut Supreme Court as conduct "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Carrol v. Allstate Ins. Co.*, 262 Conn. 433, 443 (2003).

Plaintiff has not demonstrated a genuine issue of material fact with respect to defendants Murphy or Lajoie on this issue. He has not submitted evidence indicating any intentional action on behalf of Lajoie or Murphy prior to his being attacked or threatened by Giangreco or Conte. Instead, he supports his allegations primarily with evidence of submissions made to their offices and the fact that they did not respond as he desired. Defendants Murphy and Lajoie, high-ranking officials within the DOC, assert that they were not involved in selecting cells at NCI. Doc. #140-11 at ¶¶2, 36. The only specific evidence plaintiff points to in response is defendant Murphy's statements that he was responsible for coordinating and controlling the operations of DOC. Doc. #150-3 at 44. Murphy and Lajoie's general high-level supervisory authority is not enough, without more, to allow a reasonable jury to find that they were behind the selection of plaintiff's cellmate and acted intending to cause him emotional distress. The motion for summary judgment on plaintiff's IIED claim is therefore granted with respect to defendants Murphy and Lajoie.

Plaintiff has, however, raised enough evidence that a jury could find that Cahill or Quiros committed the tort of intentional infliction of emotional distress. As discussed above, plaintiff has submitted evidence that could lead a trier of fact to conclude that Cahill and/or Quiros knew of the risk Giangreco posed and either arranged for or allowed for Giangreco to be celled with plaintiff in retaliation for plaintiff's filing suits against them. A jury could find that such actions were intentional. Quiros, the warden at NCI, and Cahill, a captain and housing unit manager at NCI, were each more involved in the day-to-day operations of NCI than Murphy and Lajoie. Doc. #140-11. And unlike Murphy and Lajoie, Quiros and Cahill both threatened plaintiff

directly and urged him to drop his litigation. Quiros and Cahill's interactions with plaintiff display a level of animosity that could lead a reasonable jury to infer that they intended plaintiff emotional distress. Such an inference could be bolstered by the fact that after being removed from the cell he shared with Giangreco, plaintiff was assigned a cell with Conte, who had been on single-cell status for over thirteen years and had a history of violent attacks on cellmates.

If a jury found that Quiros and Cahill intended for plaintiff to be put in a cell with inmates who were likely to severely injure him, a jury could certainly find that to be "utterly intolerable in a civilized community." *See Carrol*, 262 Conn. at 443. Plaintiff has also described how being celled with Giangreco caused him to fear for his life and beg NCI's staff to be removed from the cell. Doc. #1 ¶ 21. A jury could find that this constituted severe emotional distress and was caused by defendants' intentional actions. As a result, it would be possible for a jury to find in plaintiff's favor on all four elements of his IIED claim.

    *C. State Constitutional Claims*

Plaintiff has also alleged numerous claims against defendants under the Connecticut Constitution, Art. I, §§ 4, 5, 7, 8, 9, 10, and 14. Defendants contend that the Court should decline to exercise jurisdiction over these claims for the reasons set forth by Judge Kravitz in *Lopez v. Smiley*, 375 F. Supp. 2d 19 (D. Conn. 2005); *see also Doe v. Mastoloni*, 2016 WL 593439, at *17 (D. Conn. 2016) (collecting federal cases declining to exercise jurisdiction over implied causes of action under the Connecticut Constitution beyond those recognized by the Connecticut Supreme Court). Because plaintiff has not responded to defendants' argument, I deem his claims to be abandoned and will grant summary judgment as to plaintiff's state constitutional claims.

## CONCLUSION

Defendants' motion for summary judgment is GRANTED with respect to the state law battery claim and state constitutional claims as to all defendants, and the state law intentional infliction of emotional distress claim as to defendants Murphy and Lajoie. Because there are no longer any claims outstanding as to Murphy and Lajoie, they are dismissed as defendants in this action. Defendants' motion for summary judgment is otherwise DENIED with respect to plaintiff's federal claims against Quiros and plaintiff's state law intentional infliction of emotional distress claim as to defendants Quiros and Cahill. This matter shall proceed to trial against Quiros and Cahill as to the federal constitutional claims set forth in Counts Two through Four and the state law intentional infliction of emotional distress claim set forth in Count Five.

It is so ordered.

Dated at New Haven, Connecticut, this 26th day of September 2016.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge